IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

＊

LYNETTE HARRIS
    Plaintiff  ＊

  v.        ＊   CIVIL NO. SKG-06-2415

MAYOR AND CITY COUNCIL  ＊
OF BALTIMORE
    Defendants.  ＊

＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊

<u>Memorandum Opinion</u>

Presently before the Court on remand from the United States
Court of Appeals for the Fourth Circuit is an issue not reached
in this Court's previous decision granting summary judgment in
favor of Defendant Mayor & City of Baltimore (the "City"):
Whether Plaintiff Lynette Harris ("Harris") has demonstrated
some factual basis for imputing liability to her employer, the
City, as required to support a <u>prima</u> <u>facie</u> case of hostile work
environment sex discrimination under Title VII of the Civil
Rights Act of 1964, 42 U.S.C. § 2000e-2. (ECF No. 64, 40 n.6).
The City reasserts entitlement to summary judgment on this sole
remaining issue and has submitted supplemental briefing. (ECF
No. 83). Harris has notified the Court that she does not intend
to submit supplemental briefing. Thus, the issue of employer
liability is ripe for review and the Court now rules pursuant to
Local Rule 105.6, no hearing being necessary. For the reasons

1

set forth below, the City's motion for summary judgment on the issue of employer liability is hereby DENIED.

## I. Procedural History

Harris filed the underlying suit against the City, her employer, on September 18, 2006. (ECF No. 1). Harris's amended Complaint contained four counts: (1) violation of equal protection under 42 U.S.C. § 1983 and Article 24 of the Maryland Declaration of Rights; (2) common law intentional infliction of emotional distress; (3) common law negligent supervision and retention; and (4) sex-based discrimination under Title VII, 42 U.S.C. § 2000e-2, encompassing a hostile work environment claim and two failure to promote claims. (ECF No. 17). On September 30, 2008, this Court granted summary judgment in favor of the City on all counts except for Harris's failure to promote claim pertaining to the 2004 promotion cycle. (ECF No. 64).

This Court recognized that, in order to prevail on a hostile work environment claim under Title VII, 42 U.S.C. § 2000e-2, Harris must establish that: (1) the conduct in question was unwelcome; (2) the harassment was because of her sex; (3) the harassment was sufficiently severe and pervasive to create an abusive work environment; and (4) some basis exists for imputing liability to the employer. (ECF No. 64, 21) (citing Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 331 (4th Cir. 2003)). Finding that Harris satisfied the first element of

the aforementioned test, but failed as a matter of law to establish the second and third elements (id. at 21-22), the Court granted summary judgment in favor of the City without reaching the issue of employer liability, the fourth prong of the prima facie case (id. at 40 n.6). After additional discovery, the City filed a second motion for summary judgment on the remaining failure to promote claim. (ECF No. 70). This Court granted that motion on March 24, 2009. (ECF No.74).

Harris noted an appeal of this Court's grant of summary judgment on all counts to the Fourth Circuit on April 13, 2009. (ECF No. 75). The Fourth Circuit reversed this Court's grant of summary judgment on Harris's hostile work environment claim and attendant § 1983 claim on the basis that a jury could reasonably conclude that the hostility of Harris's work environment was based on her gender and that the harassment was sufficiently severe and pervasive to create an abusive work environment (ECF No. 79, 17-20). The Fourth Circuit affirmed the grant of summary judgment on Harris's other claims. (ECF No. 79, 6).

On remand, this Court shall treat as established the first, second and third elements of Harris's hostile work environment claim. Thus, the sole issue before the Court is whether the City is entitled to summary judgment on the fourth element, namely whether some basis exists for imputing liability to Harris's employer, the City. See Franklin v. King Lincoln-

3

Mercury, 51 F.Supp.2d 661, 665 (D. Md. 1999) ("Once a hostile work environment has been established, the Court must then look to the issue of liability – the fourth and final element.").

## II. Facts

Plaintiff Lynette Harris is a Maintenance Technician III Electrical employed by the Defendant City of Baltimore's Department of Public Works. (ECF No. 51, Ex. 3, ¶ 1). In support of her claims and in opposition to the City's motion for summary judgment, Harris provided an affidavit and supplemental affidavit, excerpts from her deposition and deposition excerpts of other Department of Public Works ("DPW") employees, and documentary evidence. The essential facts of the case, either undisputed or, where disputed, recited in the light most favorable to Harris as the nonmovant, are as follows.

Harris began working for the City in the DPW as a Maintenance Technician Apprentice Electrical in November 1988. (ECF No. 51, Ex. 1, 20). She received her certificate of completion of the apprenticeship program in November 1991 and became a Maintenance Technician II Electrical at that time. (Id. at 15-16). Harris was promoted to her current position of Maintenance Technician III Electrical in October 1994. (Id. at 20). During the course of her employment with DPW, Harris has worked at both the Patapsco and Back River plants, as well as at various pumping stations. (ECF No. 51, Ex. 5, 64). Women

constituted a small minority of the overall workforce at these plants. (ECF No. 79, 7).

Harris alleges that the first incident of harassment occurred on September 18, 2001, when supervisor James Gernhardt, Jr. called her a "bitch" when she did not find him to take a phone call from his wife. (ECF No. 51, Ex. 1, 34-39). In response, Harris requested counseling from Employee Assistance, but her supervisors at first denied her request. (Id. at 35). Three years later, on December 20, 2004, Harris was assigned to work directly under Gernhardt. (Id. at 35, 131). The environment of the shop in which Gernhardt was supervisor and the conduct of the employees that worked within it form the main basis for Harris's hostile work environment allegations.

Harris states that she heard co-workers and supervisors refer to women as "bitches" almost daily from the beginning of her employment to approximately April 2005. (ECF No. 59, Ex. 3, ¶ 1). Harris also states that she was repeatedly exposed to calendars and photographs of partially clothed or naked women hanging in the common areas at DPW and under the glass of the table in the lunchroom. (ECF No. 51, Ex. 1, 47-48; ECF No. 59, Ex. 3, ¶ 2). Storeroom supervisor Judy Coleman observed in her deposition that these pictures were in "all the shop areas" (ECF No. 51-6, 18), and Harris's co-worker, Edwin Moye, disclosed that these pictures were "[i]n the shop area and [on] the hall

bulletin board." (ECF No. 51-13, 12). In July 2002, Harris complained about these images to Coleman, who reported the matter to supervisor Rick Slayton, and the pictures were removed. (ECF No. 49, Ex. 3, 47). Harris then noticed that the pictures were re-hung shortly after their removal. (Id. at 50). When she reported them to Coleman a second time, they once again were removed within days. (Id. at 51). Harris claims that she complained numerous times between 2002 and 2005 about other pictures in the workplace, but these complaints were not taken seriously until she wrote a letter in December 2004. (ECF No. 51, Ex. 1, 47). She also filed internal complaints within DPW, and wrote a letter to EEO compliance officer Barbara Neale regarding this harassment. (ECF No. 51, Exs. 19, 22). The photos were removed in February 2005. (ECF No. 51, Ex. 23). At that time, Rick Slayton was suspended for one day due to his previous failure to remove the pictures. (ECF No. 51, Ex. 12).

The next incident occurred on January 5, 2005, when management conducted a safety meeting attended by plaintiff's co-workers and supervisors. (ECF No. 59, Ex. 3, ¶ 2). Harris was not invited to attend the meeting and instead was required to sit at a table with provocative photos under the glass. (Id.). Harris adds that such meetings were held on a daily basis from July 2002 through February 2005. (ECF No. 59, Ex. 3, ¶ 2). She says she was not ever invited to attend such meetings, and was

forced to sit at the table with provocative photos under the glass every day for an hour to an hour and a half, until the meetings were over.  (Id.).

Harris further states that on February 10, 2005, Gernhardt became enraged and destroyed items in the workshop using a crowbar.  (ECF No. 51, Ex. 18).  She asserts that on February 16, 2005, she was injured when Gernhardt required her to perform a two person task by herself, denying her request for assistance.  (Id.).  Similarly, on April 18, 2005, Harris claims she was forced to work in an unsafe environment.  When she complained about the conditions, she received a reassignment.  (Id.).  Harris reports that she and other women were routinely given different work assignments than similarly situated males, and specifically were not given those requiring heavy equipment.  (ECF No. 51, Ex. 17, 19-20; Ex. 7, 13).

Harris also alleges that in 2005, she heard a variety of inappropriate comments in the workplace involving the male anatomy, specifically co-workers and supervisors using the words "balls" and "dick." (ECF No. 59, Ex. 3, ¶ 5.).  In January 2005, Harris heard a co-worker, Ron Sutton, talk about a man having "three balls."  (ECF No. 51, Ex. 18).  She also heard Sutton say that speed bumps are a "pain in his dick."  (Id. at 3).  Then, in February 2005, Harris heard Sutton say "bitch" several times in front of her and others.  (Id. at 4).  He also said he would

"bet his left nut." (Id.). Harris then heard two co-workers discuss a weekend trip to the "titty bar" in the motor repair shop. (Id.). She also heard Sutton tell Gernhardt, in the presence of many workers, that he would "eat his dick" if Gernhardt could get to work on time. (Id.; ECF No. 51, Ex. 1, 53). Harris also overheard a co-worker tell Gernhardt, "if my dick was that little, I wouldn't pull it out." (ECF No. 51, Ex. 18). She claims she often overheard co-workers asking each other if they "got any pussy" that weekend. (Id.). Then, in May, Harris heard a co-worker, Ed McKinney, say to another co-worker, "if his wife's pussy got wet you would hear it sloshing." (Id. at 5). In June 2006, Harris heard an outside contractor call an unidentified female employee "that fat bitch," and supervisor Deryl Smith responded by laughing. (Id. at 12). In 2004, Harris heard a co-worker tell his supervisors they could suck his dick. (ECF No. 59, Ex. 3, ¶ 11). Co-workers also discussed female anatomy in a sexual manner, including use of the word "titty." (ECF No. 59, Ex. 3, ¶ 8). According to Harris, conversations of this sexual nature happened frequently at DPW. (ECF No. 51, Ex. 8, 18-19; Ex. 13, 22-23; Ex. 17, 13-15, 19). In addition, Harris saw male co-workers grabbing their private parts and making obscene gestures a couple times per week, and heard the word "fuck" almost daily from the start of her employment at DPW through April 2005. (ECF No. 59, Ex. 3,

¶¶ 10, 12). Harris also has heard at least three other female co-workers complain about how they were treated at DPW. (ECF No. 59, Ex. 3, ¶ 9).

Harris's description of the general environment at the shop and particular conduct was corroborated by several other DPW employees. For instance, Coleman testified that she heard men – technicians – refer to women as "bitch" and other derogatory names such as "cunt" and "troublemaker." (ECF No. 51, Ex. 6, 12-13). According to Coleman, the use of such language increased when females came within earshot. (ECF No. 51, Ex. 6, 7). Coleman said she heard the word "bitch" "a lot" in this male dominated environment, more specifically "off and on, every now and then – sporadically." (Id. at 14). She heard "cunt" "maybe a couple of times" and women characterized as "troublemakers" "a lot in the last 23 years." (Id.). Coleman said this type of language occurred "in the last five years off and on" but "[t]he last couple of years hasn't been bad at all." (Id. at 15). As to inappropriate photos or drawings in the workplace – women in bathing suits and some nudes – she said she has seen in shop areas "in last year or year before but not now." (Id. at 31-32).

Edwin Moye, Harris's co-worker, similarly acknowledged conversations of a sexual nature among the men in the workplace on a frequent basis. (ECF No. 51, Ex. 13, 21-22) ("men hold

those conversations when we are with each other, kid and joke").

Moye also testified that he heard his co-workers use crude or filthy language in the workplace, such as "cunt" or "fuck," though did not testify that it was directed at any particular woman. (Id. at 23). Moye reported he was told there was a comment in another employee's journal that Harris "thinks she's one of the guys, typical bitch." (ECF No. 51, Ex. 13, 18-19).[1]

Kevin Lee, Harris's co-worker in the Back River plant, testified to the frequent workplace conversations of a sexual nature. (ECF No. 51, Ex. 17, 13-14). He said the conversations occurred daily and that Harris would certainly have heard those conversations. (Id. at 14-15). Lee also remembered the presence of nude pictures of women in the workplace within the last five years ("awhile back"), but recalled that "they actually had some people from downtown [come] and had them removed." (Id. at 15).

On several occasions, Harris complained to her supervisors about her working conditions, including her assignment to Gernhardt's shop. Based on these complaints, Ron Williams, Harris's union representative, called a meeting with her supervisors Slayton and Gernhardt, as well as her co-worker, Ron

---

[1] The reference to Harris as a "bitch" in another employee's non-public journal reported by a second employee was hearsay and not in admissible form for this Court's consideration.

Sutton, to address the situation.  (ECF No. 51, Ex. 21).  During

the meeting, Sutton repeatedly referred to Harris as a "bitch."

(ECF No. 51, Ex. 2).  At one point, Williams objected to this

language and Sutton responded by asking Slayton whether there

was any policy prohibiting him from using the word "bitch."

(Id.).  Slayton said that there was not, and Sutton continued.

(Id.).  At the end of the meeting, Gernhardt agreed to speak to

his employees about using "bad language" around Harris, but

Slayton refused to reassign her.  (Id.).  Gernhardt stressed

that he did not want Harris in his shop, but that he was "being

forced to take her."  (Id.).  Williams recorded in his notes

that he was "very disappointed with the action (verbal) of the

men in the motor shop and both supervisors that were there."

(ECF 51, Ex. 20).  Williams further commented that management's

actions demonstrated "a clear message of the prejudice practiced

in the electrical shops."  (Id.).

### III.  Legal Standard

Summary judgment is appropriate when "the pleadings,

depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no

genuine issue as to any material fact and the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also

Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970) (moving

party must initially show "the absence of a genuine issue as to

11

any material fact"). Materiality is determined by the substantive law pertaining to a particular claim. Anderson, 477 U.S. at 248.

Once the moving party has met this requirement, the burden shifts to the nonmoving party to prove there is a genuine issue for trial and that evidence exists to prove the elements of the party's substantive law claims. Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 321 (1986); Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Sylvia Development Corp. v. Calvert County, 48 F.3d 810, 817 (4th Cir. 1995). To survive summary judgment, the non-moving party must produce "specific facts showing that there is a genuine issue for trial," and may not rest upon the "bald assertions of [its] pleadings." Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the nonmoving party fails to prove an essential element of its case, all other facts become immaterial and the moving party should be granted judgment as a matter of law "because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex, 477 U.S. at 323.

The role of the Court at the summary judgment stage is not to "weigh the evidence and determine the truth of the matter," but rather to determine whether "there are any genuine factual

issues that can properly be resolved only by a finder of fact because they may be resolved in favor of either party." Anderson v. Liberty Lobby, 477 U.S. 242, 249-50 (1986). Evidence submitted both in support of and in opposition to a motion for summary judgment must be admissible and based on personal knowledge. Fed. R. Civ. P. 36; Celotex, 477 U.S. at 323-24; Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

## IV.  Discussion

The City argues in its motion for summary judgment that Harris has failed to establish a prima facie case for hostile work environment discrimination because she cannot demonstrate a sufficient basis for imputing liability to the City for the conduct of its employees.  (ECF No. 49-2, 20-21).  As movant, the City bears the initial burden of demonstrating the absence of any genuine issue of material fact with respect to employer liability.  Adickes, 398 U.S. at 157.  Harris argues that the record supports employer liability for the harassing conduct of both her supervisors and co-employees at the DPW.  (ECF No. 51, 39-42).  The Court finds that the City has failed to demonstrate the absence of any genuine issue of material fact with respect to employer liability and thereby DENIES the City's motion for summary judgment.

The governing standard set forth by the Supreme Court in Burlington Industries v. Ellerth, 524 U.S. 742 (1998), and

Faragher v. City of Boca Raton, 524 U.S. 775 (1998),

significantly clarified the extant law respecting employer

liability under Title VII.  The Court held that under the aided-

by-agency principle expressed in Restatement (Second) of Agency

§ 219(2)(d), "as adapted to the principles of Title VII,"

Faragher, 524 U.S. at 802 n.3, "an employer is subject to

vicarious liability to a victimized employee for an actionable

hostile environment created by a supervisor with immediate (or

successively higher) authority over the employee," Ellerth, 524

U.S. at 765; Faragher, 524 U.S. at 807.  An employer is not

automatically liable, but rather "subject to" liability, because

not all harassment even by supervisory personnel is necessarily

"aided by the agency relationship."  Mikels v. City of Durham,

183 F.3d 323, 331 (4th Cir. 1999) (citing Ellerth, 524 U.S. at

763, for the concept that some acts of harassment by a

supervisor might be the same acts as a co-employee would commit

and that there may be some circumstances where the supervisor's

status makes little difference).  Thus, "[t]he fundamental

determinant of this form of vicarious liability is not . . . the

harasser's formal rank vis-à-vis that of the victim in the

particular employment hierarchy, but whether the particular

conduct was 'aided by the agency relation.'"  Id. (citing

Ellerth, 524 U.S. at 763).

Where harassing conduct results in a "tangible employment action" against the victim, it is necessarily aided by the agency relation and vicarious liability is absolute, without regard to whether the employer knew or should have known, or approved of the act, or sought to prevent or to stop it.  See Faragher, 524 U.S. at 789.  Where otherwise actionable harassment does not culminate in tangible employment action but is "aided by the agency relation," vicarious liability is not absolute, but subject to the affirmative defense that the employer had (1) exercised reasonable care to prevent and correct promptly any sexually harassing behavior and (2) the victim had unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  See Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807.  Of course, this type of vicarious liability can only arise from the conduct of an employee having some measure of authority over the victim.  On the contrary, harassment by a fellow employee with no authority over the victim can never be found to be "aided by the agency relation." Ellerth, 524 U.S. at 763.  With respect to such unaided harassment by a co-employee, employers are only liable for their own negligence in failing, after actual or constructive knowledge, to take prompt and adequate action to stop it.  See id. at 762.

In the instant matter, Harris alleges hostile work environment sexual harassment by both supervisors and co-employees, but does not allege that she suffered a tangible employment action as a result of this harassment. (ECF No. 51, 39-42). The City asserts that "[Harris's] attempt to impute liability to the City based on supervisory harassment must fail, as there is insufficient proof that [she] was harassed by her male supervisors." (ECF No. 54, 13). With respect to Harris's claims of co-employee harassment, the City argues that it was not negligent as a matter of law because Harris failed to file formal complaints, complained only sporadically, and the City took prompt remedial action. (ECF No. 49-2, 21-23).

**A. Supervisor Harassment**

The Court disagrees with the City's assertion that "[t]he only claim of supervisory harassment that Plaintiff makes involves the September 18, 2001 incident between her and James Gernhardt, in which Gernhardt allegedly called Plaintiff a "bitch." See (ECF No. 49-2, 24). On the contrary, Harris complains of a number of instances of supervisor conduct that arguably created an actionable hostile work environment at the DPW. For instance, Harris maintains that she personally "heard co-workers and supervisors refer to women as 'bitches' almost daily" from the beginning of her employment through approximately April 2005. (ECF No. 59-2, ¶ 1). She also

asserts that she heard both co-workers and supervisors make
sexually explicit comments about male anatomy in the workplace.
(ECF No. 59, Ex. 3, ¶ 5).  Harris reported hearing an outside
contractor call a female employee "that fat bitch" and
supervisor Deryl Smith responded by laughing.  (Id.; ECF No. 51,
Ex. 18, 12).  Ron Williams, Harris's union representative,
indicates that supervisor Rick Slayton permitted Ed Sutton, an
employee under his supervision, to call Harris a "bitch"
repeatedly during a meeting intended to address such conduct.
(ECF No. 51, Ex. 20).  The record also indicates that Slayton
was suspended for failing to comply with the EEO's instruction
to remove provocative pictures of women in a timely manner from
the work site.  (ECF No. 51, Ex. 12).  Harris's supervisors
reportedly did not invite her to attend safety meetings, instead
directing her to sit at a table in the lunchroom where such
prohibited pictures were visible under the glass tabletop.  (ECF
No. 59-2, ¶ 3).  While Gernhardt's calling Harris a "bitch" may
be the most direct harassment alleged, it is not the only
instance of supervisor conduct that might be seen as creating a
hostile work environment.

    In evaluating this conduct pursuant to the Faragher-Ellerth
standard discussed supra, the Court must first determine whether
the actors Harris describes as supervisors - particularly
Gernhardt and Slayton - are properly identified as such, or are

more accurately categorized as co-workers.  Considering this question in Mikels v. City of Durham, the Fourth Circuit held that when determining whether a harasser is a plaintiff's supervisor, "whether the particular conduct was aided by the agency relation" is a critical consideration.  183 F.3d 323, 332 (4th Cir. 1999).  The Mikels court elaborated that, "the determinant is whether as a practical matter [the harasser's] employment relation to the victim was such as to constitute a continuing threat to her employment conditions that made her vulnerable to and defenseless against the particular conduct in ways that comparable conduct by a mere co-worker would not." 183 F.3d at 333.

The Fourth Circuit has also held that the ability to take tangible employment actions is the "most powerful indication of supervisory status."  Howard v. Winter, 446 F.3d 559, 566 (4th Cir. 2006); see also Ellerth, 524 U.S. at 761 ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").  However, the absence of the ability to take tangible employment actions does not foreclose the possibility that the harasser is the plaintiff's supervisor.  Whitten v. Fred's Inc., 601 F.3d 231, 244 (2010) (emphasis in the original).

The Fourth Circuit in Howard, 446 F.3d at 565-66, and Whitten, 601 F.3d at 245-46, discussed other features of the employment relation that bear upon supervisory status. For instance, the Whitten court looked to, inter alia, the harasser's title and formal rank vis-à-vis the victim in the particular employment hierarchy; whether the harasser was the highest ranking employee on site generally and at the time of the alleged conduct; whether the harasser directed the victim's activities and controlled her schedule; whether the harasser had the authority to discipline the victim; and whether both parties believed that the harasser was a supervisor. 601 F.3d at 246.

In the instant matter, it is not totally clear whether Gernhardt and Slayton possessed the power to take tangible employment action against Harris. As stated supra, Harris does not assert that any tangible employment action was in fact taken against her. Nonetheless, the record indicates that Gernhardt and Slayton each were able to exert control over Harris's routine work assignments. (ECF No. 51-18, 3-4) (stating that Slayton "placed Plaintiff under his supervision," that Gernhardt placed her on an unsafe assignment during which she was injured, and that Slayton subsequently denied her request for reassignment). It is also clear from the record that Harris, as maintenance technician, was in a non-supervisory position in the

electrical shop; she did not have the power to direct her own duties, but instead worked at the direction of supervisors.

In addition, Gerhardt's and Slayton's titles (Supervisor I – Electrical Maintenance and Supervisor II – Electrical Maintenance, respectively) strongly suggest that they had authority over Harris, an electrical maintenance technician. "While the parties' titles may not be dispositive, 'the harasser's formal rank vis-à-vis the victim in the particular employment hierarchy . . . is of critical and sometimes decisive evidentiary importance.'" Whitten, 601 F.3d at 246-47 (citing Mikels, 183 F.3d at 331-32). The additional fact that Slayton was Gernhardt's immediate supervisor further suggests that they were in a position to constitute a threat to Harris's employment conditions in a way that a co-worker could not. Critically, the City did not contest the supervisory status of Gernhardt and Slayton, and it is clear from Harris's submissions that she believed that both men had supervisory authority over her. For these reasons, the Court finds that Gernhardt and Slayton are properly considered "supervisors" as a matter of law for the purpose of Harris's hostile work environment claim under Title VII.

Harris also describes the conduct of Derek Smith and "other supervisors" in her submissions. See e.g., (ECF No. 51, Ex. 18, 12) (recounting a situation in which an independent contractor

referred to a DPW as a "fat bitch" and supervisor Deryl Smith
responded by laughing). While it is not clear from the record
whether this behavior and other conduct attributed to
unidentified supervisors was "aided by the agency relation," a
jury may well identify harassing supervisory conduct beyond the
instances attributable to Gernhardt and Slayton.

As the Fourth Circuit determined in this case, "[a]
reasonable jury, looking at the entirety of the circumstances,
could find that the shop area was an environment where hostility
towards female employees pervaded the attitudes and conduct of
co-workers and supervisors." (ECF No. 79, 19) (emphasis added).
Gernhardt and Slayton contributed to the pervasive hostile work
environment at DPW by using demeaning language in reference to
Harris and in conversation with her co-employees, by permitting
her co-employees to refer to her as a "bitch" and carry on
conversations of a sexually explicit nature in the workplace,
and by allowing the display of provocative images of women
throughout the shop. As the Fourth Circuit noted in this
matter, "a reasonable juror could find that these pictures
sexualized Harris's work place." (ECF No. 79, 16). In
addition, there is a question of whether Smith's laughter in
response to an independent contractor calling a DPW employee a
"fat bitch" also constitutes supervisory harassment. See (ECF
No. 51, Ex. 18, 12). A jury might reasonably determine that

this and the conduct of other as yet unidentified supervisors contributed the actionable hostile work environment experienced by Harris at DPW.

Accordingly, this Court finds that there exists a triable issue of fact as to whether Harris's supervisors created and perpetuated this pervasive hostile work environment at DPW both by engaging in harassing conduct themselves and by failing to address such conduct on the part of Harris's co-employees.  This finding does not, however, automatically establish vicarious liability.  As discussed supra, the City may raise an affirmative defense to liability for the actions of supervisors."  Faragher, 524 U.S. at 788.  In order to satisfy the first prong of this defense, the City must show that there is no triable issue of fact as to whether it exercised reasonable care to prevent and correct promptly any sexually harassing behavior.  Id. (emphasis added).

The City asserts that "[c]oncerning Plaintiff's claims of supervisory harassment, it is undisputed that since 1990, the City had in place a comprehensive policy governing the filing of internal and external complaints of sexual harassment."  (ECF No. 49-2, 24) (citing ECF No. 49, Ex. 11).  An employer's adoption of an effective anti-harassment policy is an important factor in determining whether it exercised reasonable care to prevent sexually harassing behavior.  Smith v. First Union Nat'l

Bank, 202 F.3d 234, 244 (4th Cir. 2000).  The Supreme Court has

noted that "while proof that an employer had promulgated an

anti-harassment policy with complaint procedure[s] is not

necessary in every instance as a matter of law, the need for a

stated policy suitable to the employment circumstances may

appropriately be addressed in any case when litigating the first

element of the defense."  Ellerth, 524 U.S. at 765.  In

addition, while the existence of an anti-harassment policy is

not dispositive of the first element being satisfied, a suitable

policy that provides reasonable assurances that such conduct

will be prevented and an effective mechanism is in place to

address all complaints will suffice.  Id.

Interpreting Ellerth in Brown v. Perry, the Fourth Circuit

held that any anti-harassment policy an employer adopts must be

"both reasonably designed and reasonably effectual."  184 F.3d

388, 396 (4th Cir. 1999).  The City has failed to demonstrate

here that its policy was reasonably effectual because much of

the prohibited conduct persisted even after reports and

investigations.  In addition, a reasonable jury could find that

the City's anti-harassment policy is not reasonably designed on

the basis that it does not clearly prohibit gender-based

harassment that is not of a sexual nature.

Based on the factual record, the Court finds that a

reasonable jury could determine that the City's anti-harassment

policy was not "reasonably effectual."  Although the City argues
that it took prompt and effective corrective remedial action
with regard to Harris's complaints about provocative images of
women displayed in the workplace, the record indicates that the
pictures were either not removed or were reposted.  (ECF No. 51-
12, 1).  In addition, despite the City's anti-harassment policy,
supervisor Patricia Odle in her deposition testimony stated that
calendars depicting women in swimsuits are appropriate for the
workplace as long as they are not in an open area and do not
depict nudity.  (ECF No. 51-5, 17).  Storeroom supervisor Judy
Coleman reports that she complained to other supervisors on
several occasions about the use of derogatory language such as
"bitch," "cunt," and "troublemaker" to refer to women, but that
they "didn't do anything" in response.  (ECF No. 51-6, 8).
Finally, supervisor Rick Slayton openly permitted employee Ed
Sutton to refer to Harris as a "bitch" during a meeting with Ron
Williams, Harris's union representative.  (ECF No. 51, Ex. 20).

     In addition, a reasonable jury could find that the policy
was not reasonably designed to prevent and address the type of
gender-based hostile work environment harassment Harris
experienced in this case.  In Smith, the Fourth Circuit held
that an employer failed to satisfy the first prong of the
Faragher-Ellerth defense where its anti-harassment policy merely
prohibited unwanted sexual advances and other sexually

provocative misconduct, but did not mention discrimination on the basis of gender. Smith, 202 F.3d 234, 245 (4th Cir. 2000). In this case, the City's policy provides that,

> [u]nwelcome sexual advances, request [sic] for sexual favors and other verbal and physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individuals, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

ECF No. 51-22). As in Smith, the City's definition of sexual harassment encompasses only conduct of a sexual nature and does not explicitly prohibit discrimination on the basis of gender. Thus, although the City's policy clearly prohibits some conduct that contributed to the hostile work environment Harris experienced, such as the display of provocative images of nude or scantily clad women, other conduct at issue here is not clearly prohibited by the City's policy, such as references to women as "bitches," "cunts," or "troublemakers."

This is not to say that the City cannot establish the first prong of the affirmative defense; a fact finder may well ultimately conclude that the City's anti-harassment policy and prompt corrective action do establish this prong. However, when Harris's evidence is considered in the light most favorable to

her as non-movant, see Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986), the City has failed to establish the first prong as a matter of law.

The Court also finds that the City failed to satisfy its burden as movant with respect to the second prong of its affirmative defense to vicarious liability.  In order to satisfy the second prong of the affirmative defense to vicarious liability, the City must show that there is no triable issue of fact as to whether Harris unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  Faragher, 524 U.S. at 788. The record reflects that Harris complained verbally and in writing on numerous occasions, and that she complained to DPW supervisors as well as the City's EEO.  Thus, the City is unable to establish as a matter of law that Harris "unreasonably failed to take advantage of any preventive or corrective opportunities," and cannot satisfy the second prong of the affirmative defense.

**B.  Co-Employee Harassment**

As discussed supra, with respect to co-employee harassment, the City must demonstrate that there exists no triable issue of fact as to whether it was negligent in failing, after actual or constructive knowledge, to take prompt and adequate action to stop the harassment.  Ellerth, 118 U.S. at 2267 (noting that

"negligence sets a minimum standard for employer liability under Title VII"). The Fourth Circuit has stated that the an employer is liable for co-employee hostile work environment harassment where "after having acquired active or constructive knowledge of the allegedly harassing conduct, the employer had taken no prompt and adequate remedial action to address it." Mikels v. City of Durham, 183 F.3d 323, 329 (4th Cir. 1999) (internal quotations omitted). Fourth Circuit precedent "has not required that particular remedial responses be the most certainly effective that could be devised," id. (citing Spicer v. Virginia Dep't of Corrections, 66 F.3d 705, 710 (4th Cir. 1995)), and has "given great weight to the fact that a particular response was demonstrably adequate to cause cessation of the conduct in question," id. (citing Spicer, 66 F.3d at 710-11).

Harris has submitted documentary evidence of her numerous complaints to the City regarding harassing conduct at the DPW. On September 18, 2001, she completed a Bureau of Water and Wastewater Investigation Report Form concerning the incident in which Gernhardt allegedly yelled at her and called her a "bitch." (ECF No. 51-19, 1-3). Harris also submitted a letter that she wrote on April 17, 2003 to EEO Officer Lisa Clinton Jones describing, inter alia, the posting of sexually explicit pictures in the workplace. (ECF No. 51-19, 15-17). In addition, the City submitted a suspension letter from the EEO to

Slayton dated February 23, 2005.  (ECF No. 49-7).  These
documents indicate that the City had actual notice of Harris's
allegations of harassment at the DPW.  Although the record
indicates that the City conducted an investigation and
instructed DPW management to remove offending pictures, and
subsequently suspended Slayton when the pictures were not
removed or reappeared, the facts demonstrate that much of the
conduct in question continued.  (ECF No. 49-11).  Thus, a jury
could reasonably find that the City's response was demonstrably
inadequate to the extent of negligence.

### V. Conclusion

    For the reasons set forth herein, the Court finds that the
City has failed to demonstrate the absence of any material fact
with regard to employer liability in the instant matter.  The
Court concludes that Harris's evidence is sufficient to require
a trial on the merits of her hostile work environment claim.
Although the Court concludes that Gernhardt and Slayton were
Harris's supervisors as a matter of law, such that the City is
vicariously liable for their conduct, there is no tangible
employment action at issue here.  Thus, the City will be
entitled to assert at trial the affirmative defense to liability
and damages set forth in Faragher and Ellerth.  With respect to
liability for co-employee harassment, the Court finds that the
City had actual notice of employee conduct creating a hostile

work environment and that there is a triable issue of fact with respect to whether the City was negligent in failing to take prompt and adequate corrective action.  Accordingly, the City's motion for summary judgment on the issue of employer liability is hereby DENIED.


Date: 6/23/11                              /s/
                              Susan K. Gauvey
                              United States Magistrate Judge